**ROWE | MULLEN LLP**
Martin Mullen (SBN 137974)
James Brasher (SBN 171139)
3636 Nobel Drive, Suite 215
San Diego, California 92122
Telephone:  (858) 404-9800
Facsimile:  (858) 404-9833

**FRIEDHOFER PC**
JAMES E. FRIEDHOFER (SBN 144832)
11410 Bracken Fern Cove
San Diego, California 92131
Telephone:  (858) 693-4400
Facsimile:  (858) 693-8800

Attorneys for Plaintiff
PONANI SUKUMAR

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PONANI SUKUMAR, an individual, | Case No. |
| | **'21CV215  GPC AGS** |
| Plaintiff, | **COMPLAINT FOR DECLARATORY RELIEF** |
| v. | |
| INTERNATIONAL OLYMPIC COMMITTEE, an international non-profit, non-governmental organization; and DOES 1-20, inclusive, | Jury Trial Requested |
| Defendants. | |

Plaintiff Ponani Sukumar alleges in support of his Complaint, as follows:

## PARTIES

1.      Plaintiff Ponani Sukumar (hereinafter "Plaintiff"), is now, and at all of

the times in this complaint mentioned was, an individual residing in San Diego

County, California.

///

2.    Plaintiff is informed and believes and thereon alleges that defendant International Olympic Committee ("IOC") is an international non-profit, non-governmental organization that is headquartered in Lausanne, Switzerland.  Plaintiff is further informed and believes that defendant IOC organizes and oversees the modern Olympic Games.

3.    Plaintiff is informed and believes that defendant IOC holds the rights to the Olympic properties, including the iconic Olympic symbol consisting of the five interlaced rings (the "Olympic Rings").  Plaintiff is further informed and believes that use of the Olympic properties, including the Olympic Rings, can only occur with the express, prior written consent of defendant IOC.

4.    The true names and capacities of defendants DOES 1 through 20, inclusive, are unknown to Plaintiff, who, therefore, sues these defendants by their fictitious names.  Plaintiff will seek leave to amend this Complaint to set forth their true names and capacities when they have been ascertained.

5.    Plaintiff is informed and believes and thereon alleges that at all times relevant hereto, DOES 1 through 20, inclusive, and each of them, were, and are now, the agents and employees of each of the other defendants herein, and in doing the acts alleged herein, were at all times acting within the course and scope of said agency and employment, with the consent and at the direction of the other defendants.  Plaintiff is informed and believes and thereon alleges that each of such fictitiously named defendants is responsible in some manner for the occurrences alleged herein.

**JURISDICTION AND VENUE**

6.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

7.    Venue is proper in this judicial district pursuant to 28 U.S.C. 1391(b)(2).

**FACTUAL ALLEGATIONS**

8.    Upon information and belief, The Swatch Group (U.S.) Inc. operates as a subsidiary of The Swatch Group AG, a Swiss business entity concentrating on the manufacture of luxury timepieces, jewelry, and leather goods.

9.      Upon information and belief, The Swatch Group (U.S.) Inc., includes Omega USA and the Omega Retail Division, which is the operator of Omega retail boutique stores nationwide, including the Omega Boutique store in San Diego, California.  (The Swatch Group (U.S.) Inc., including Omega USA and the Omega Retail Division, are collectively hereinafter referred to as "Omega.")

10.      Plaintiff is a collector of Omega timepieces.  In 2013, Plaintiff was solicited by Omega to purchase a limited edition and collectible commemorative replica gold Olympic stopwatch. According to Omega's website, the stopwatch is a limited-edition replica of the original Olympic 1932 Rattrapante chronograph used as the official timekeeper of the Olympic Games in Los Angeles.

11.      The cost of the stopwatch was approximately $110,000.  The stopwatch came with a storage pouch.  Plaintiff made it clear to Omega that he was not interested in purchasing the stopwatch unless he could have certain custom engraving, and a high quality protective leather "pouch" with ribbons that would allow him to wear the watch around his neck.  Plaintiff inquired of Omega about the specialized engraving on the stopwatch, and also about Omega designing a custom storage pouch, and related ribbons, that would allow Plaintiff to actually wear and operate the stopwatch while it was in the pouch (as opposed to the standard pouch that was only for storage).

12.      The customization requested by Plaintiff for the Omega stopwatch and pouch and ribbons included the Olympic Rings.  Specifically, Plaintiff requested that the engraving on the stopwatch include the Olympic Rings and that the Olympic Rings also be embossed on the customized leather pouch and imprinted on the related customized ribbons.

13.      Omega initially indicated that it would fulfill the requested customization, including the placement of the Olympic Rings on the stopwatch, pouch and ribbons. Based upon Omega's agreement to do so, Plaintiff agreed to purchase the stopwatch, and paid a deposit toward the purchase.  Later, Omega determined that it was unwilling, or unable, to provide the customization. Plaintiff required the customization as a

precondition to purchasing. Thus, Omega returned the deposit. The transaction was cancelled.

14.   After apparently realizing that there were not enough (or any) other purchasers willing to buy these highly unique and costly watches, Omega agreed that it would meet Plaintiff's customization requirements, including the placement of the Olympic Rings on the stopwatch, pouch and ribbons.  To that end, Omega contacted Plaintiff and confirmed that it would both engrave the watch, and have what it describes on its website to be its "Fine Leather" division create the "pouch" and ribbons, again including placement of the Olympic Rings on the stopwatch, pouch and ribbons.

15.   Based upon Omega's promises to meet Plaintiff's specifications, Plaintiff purchased the Olympic stopwatch in red (Rose) gold.

16.   In further reliance upon Omega's representation that it would customize the stopwatches, including the creation of customized pouches and ribbons, all said customization to include the Olympic Rings, in July 2014 Plaintiff agreed to purchase two additional commemorative replica gold Olympic stopwatches (one in white gold and the other in yellow gold).  Specifically, all three stopwatches, along with customized pouches and ribbons for each, were to include the Olympic Rings.

17.   The total purchase price for the three (3) stopwatches, inclusive of the customization, and taxes, was more than $350,000.

18.   In addition to soliciting Plaintiff to purchase the stopwatches, Omega also solicited Plaintiff to purchase many other products. In connection with such solicitations, Omega specifically promised Plaintiff that Plaintiff would receive desirable "special benefits" if Plaintiff became one of Omega's "best customers." Omega specifically advertises that it has the "honour" of a special relationship with the Olympic Games.  Omega promised to use its special relationship to provide Plaintiff substantial special access to Olympic tickets, parties, and athletes.

19.   On its website, Omega boasts that "[o]n 27 occasions since 1932, Omega has fulfilled the role of Official Timekeeper at the Olympic Games." Omega touts that

in 1932, the Sports Technical Director of the Olympics, William Henry, wrote: "[i]t is impossible to contemplate the wonderfully successful Olympic Games without recognizing the part played by OMEGA in this great international event." Omega asserts that "[a] great partnership had begun" after the 1932 Olympic Games. Omega repeatedly told Plaintiff that it could leverage this longstanding relationship with the Olympics to provide him with the aforementioned access and benefits.

20.    Omega used its purported "great partnership" with the Olympics as a "come on" to induce Plaintiff to purchase the aforementioned stopwatches – which its website says are "enhanced replica[s] of a 1932 pocket chronograph – the very stopwatch that had timed the Los Angeles 1932 Olympic Games."

21.    Omega delivered the three stopwatches to Plaintiff with the requested customized engraving that included the Olympic Rings.

22.    Omega, however, was not able to satisfactorily provide the promised custom pouches and ribbons.  During 2013, 2014 and 2015, Plaintiff exchanged communications with Omega regarding the customized pouches and ribbons for the commemorative replica gold Olympic stopwatches.  Those communications included specification documents.  Unfortunately, when Omega delivered the special pouches and ribbons for the watches, those items were substandard and did not meet the specifications.

23.    Plaintiff attempted to pursue the informal resolution of the issues regarding the quality and workmanship of the pouches and ribbons, including obtaining a detailed description from an expert designer as to the specific deficiencies in the design and production and a proposed action plan to resolve those deficiencies.  Omega rejected those overtures and refused to honor its promises.  It has likewise refused to refund the purchase.

24.    Defendant IOC holds the rights to the Olympic Rings, which the IOC refers to as the "Olympic symbol."  As stated on the IOC website [www.olympic.org/olympic-rings]:

**LINK TO OLYMPIC PROPERTIES**
The Olympic rings are a cornerstone of the Olympic properties, which comprise a variety of assets: the Olympic symbol, flag, motto, anthem, identifications (including but not limited to "Olympic Games" and "Games of the Olympiad"), designations, emblems, flame and torches (…) may, for convenience be collectively or individually referred to as "Olympic properties".

**Use and Rights**
All rights to the Olympic properties, as well as all rights to the use thereof, belong exclusively to the IOC, including but not limited to the use of any profit making, commercial or advertising purposes.

The Olympic symbol and the Olympic properties must be used only with the express prior written consent of the IOC.

Guidelines are available to provide direction for the use of the Olympic symbol by the Olympic Movement and its authorised stakeholders. They aim to preserve the integrity and authority of the Olympic symbol while ensuring its visibility and inclusiveness.

25. During the course of the informal resolution communications between Plaintiff and Omega, Omega represented that it had authorization from the IOC to engrave the Olympic Rings on the three stopwatches delivered to Plaintiff. Omega further represented that it had authorization from the IOC for the Olympic Rings be embossed on the customized leather pouches and imprinted on the related customized ribbons. The prototype custom pouches and ribbons that Omega showed to Plaintiff, as well as the substandard "final" custom pouches and ribbons that Omegas delivered to Plaintiff, contained the Olympic Rings.

26. When an informal resolution between Plaintiff and Omega could not be reached, Plaintiff was forced to initiate a lawsuit against Omega in the New Jersey State Court (Case No. ESX-L001411-18) regarding the dispute over the stopwatches, pouches and ribbons. In connection with that case, which is currently pending, Plaintiff requested all documents evidencing the authorization Omega had received from the IOC regarding the placement of the Olympic Rings on Plaintiffs' stopwatches and custom pouches and ribbons. Omega was unwilling or unable to produce any

///

documentation supporting its authorization to include the Olympic Rings on Plaintiffs' stopwatches and custom pouches and ribbons.

27.    Plaintiff and Omega also engaged in settlement discussions regarding the dispute.  During those discussions, Plaintiff reiterated his desire and commitment to commissioning someone to design and manufacture custom pouches and ribbons for the three Olympic stopwatches purchased from Omega.  Plaintiff proposed that he take responsibility for obtaining the custom pouches and ribbons.  In that regard, Plaintiff requested that Omega permit Plaintiff a one-time use of the Omega logo and the Olympic Rings for use on the custom pouches and ribbons Plaintiff would commission. Plaintiff's use of the Omega logo and the Olympic Rings would be consistent with their use on the previously designed custom pouches and ribbons already approved by Omega, and purportedly approved by the IOC.

28.    Omega rejected Plaintiff's proposal that Plaintiff take responsibility for obtaining the custom pouches and ribbons.  Omega's explanation for its rejection was, in part, that "Omega does not have the authority under its license to authorize a third-party to use Olympic IP and cannot therefore authorize Mr. Sukumar to use the Olympic Rings or IOC intellectual property."

29.    Omega's explanation in that regard was inconsistent from its prior actions with Plaintiff.  Omega had acknowledged that it outsourced the manufacture of Plaintiff's custom pouches and ribbons, which included use of the Olympic Rings, to a third-party vendor.  It is unclear as to why, if Omega was authorized to allow the third-party vendor to use the IOC intellectual property on the previously-produced-but-defective pouches and ribbons for the three special edition Olympic stopwatches, that same authorization could not be extended to Plaintiff in connection with the very same project – custom pouches and ribbons for the three stopwatches.  Indeed, Plaintiff even offered to use the same third-party vendor that previously worked on the subject pouches and ribbons on behalf of Omega.

///

30.     When Plaintiff was unable to obtain from Omega written confirmation of the scope of authorization, if any, granted by the IOC to Omega to include the Olympic Rings on Plaintiffs' stopwatches and custom pouches and ribbons, and Plaintiff was unable to get authorization from Omega for Plaintiff to take over responsibility for the custom pouches and ribbons, Plaintiff sought to obtain the authorization information directly from the IOC.  In an October 30, 2019 letter to the IOC, Plaintiff laid out the history of his situation with Omega and the open questions regarding the use of the IOC intellectual property on Plaintiffs' Omega stopwatches and custom pouches and ribbons.  (A copy of the October 30, 2019 letter is attached as **Exhibit "A."**)

31.     Plaintiff received no response from the IOC to the October 30, 2019 inquiry.

32.     In an attempt to avoid formal litigation, Plaintiff made a second attempt to obtain the authorization information directly from the IOC.  In a January 7, 2021 letter to the IOC, Plaintiff again explained the history of his situation with Omega and the open questions regarding the use of the IOC intellectual property on Plaintiffs' Omega stopwatches and custom pouches and ribbons.  Plaintiff's January 7, 2021 letter again requested that the IOC provide information and documentation regarding the scope of authorization, if any, granted by the IOC to Omega to include the Olympic Rings on Plaintiffs' stopwatches and custom pouches and ribbons and, by extension, Plaintiff's rights with respect to that IOC intellectual property.  (A copy of the January 7, 2021 letter is attached as **Exhibit "B."**)

33.     As with the prior effort to informally resolve this matter, Plaintiff received no response from the IOC to the January 7, 2021 inquiry.

34.     Plaintiff is currently in possession of the three customized Omega limited edition and collectible commemorative replica gold Olympic stopwatches with Olympic Rings engraved on each watch.  Plaintiff has concerns regarding the propriety of the Olympic Rings Omega included on those watches.

///

35.    Plaintiff has also failed to receive from Omega the custom pouches and ribbons that were a material term of the purchase of the three stopwatches.  As noted, the agreed-upon specifications included embossing the Olympic Rings on the pouches and imprinting the Olympic Rings on the ribbons.  Plaintiff has concerns regarding Omega's authorization from the IOC for the Olympic Rings be embossed on the customized leather pouches and imprinted on the related customized ribbons.  Plaintiff also seeks clarification of the authority to include the Olympic Rings on any custom pouches and ribbons that may be completed consistent with the original agreement between Plaintiff and Omega.

## FIRST CAUSE OF ACTION

### (Declaratory Relief Against Defendant
### and DOES 1 through 20, inclusive)

36.    Plaintiff realleges and incorporate herein by reference paragraphs 1 through 35, inclusive, of this Complaint.

37.    An actual controversy has arisen and now exists between Plaintiff, on the one hand, and defendant IOC, on the other, concerning the respective rights and duties of Plaintiff. Omega and defendant IOC with respect to the use of the IOC intellectual property, including the Olympic Rings, on the Omega stopwatches and the related custom pouches and ribbons.

38.    Pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, as well as common law, Plaintiff desires a judicial determination of the respective rights and duties of Plaintiff, Omega and defendant IOC, and each of them, with respect to the use of the IOC intellectual property, including the Olympic Rings, on the Omega stopwatches and the related custom pouches and ribbons, including but not limited to (a) the right of Omega and Plaintiff to utilize the IOC intellectual property and Olympic Rings on the three special edition stopwatches; (b) the right of Omega and Plaintiff to utilize the IOC intellectual property and Olympic Rings on the custom pouches and ribbons for Plaintiff; (c) the right of Omega to engage a third-

party vendor to produce the custom pouches and ribbons for Plaintiff that utilize the IOC intellectual property and Olympic Rings; and (d) Plaintiff's right to engage a third-party vendor to produce the custom pouches and ribbons that utilize the IOC intellectual property and Olympic Rings.

39.     A judicial declaration is necessary and appropriate at this time under the circumstance in order that the parties may ascertain their rights and duties with respect to the use of the IOC intellectual property, including the Olympic Rings, on the Omega stopwatches and the related custom pouches and ribbons.  Declaratory relief is necessary and appropriate at this time in order to avoid multiplicity of suits and circuitry of actions.

40.     Plaintiff has attempted to informally resolve these matters and has no other existing, speedy, adequate or proper remedy.

**WHEREFORE**, Plaintiff prays for judgment against defendant IOC as follows:

1.     For a judicial declaration of the respective rights and duties of Plaintiff, Omega and defendant IOC, and each of them, with respect to the use of the IOC intellectual property, including the Olympic Rings, on the Omega stopwatches and the related custom pouches and ribbons;

2.     For costs of suit herein; and

3.     For such other and further relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff requests a trial by jury on all issues so triable in this action.

Dated:     February 3, 2021          **ROWE | MULLEN LLP**

By:     */s/ Martin Mullen*
Martin J. Mullen
James Brasher
Attorneys for Plaintiff
PONANI SUKUMAR.

# EXHIBIT

# "A"



William J. Pinilis
WPinilis@ConsumerFraudLawyer.com
Certified by the Supreme Court of New Jersey as a Civil Trial Attorney

October 30, 2019

_VIA_ **FEDERAL EXPRESS**
Thomas Bach, Esq.
President of International Olympic Committee
INTERNATIONAL OLYMPIC COMMITTEE
Case Postale 356
1007 Lausanne
Switzerland

> Re:   Ponani Sukumar v. The Swatch Group (U.S.) Inc.
>        Docket No. ESX-L-1411-18
>        File No. 12140

Dear Mr. Bach:

This office represents an individual in the United States, Ponani Sukumar. The subject matter of this correspondence concerns my client's use of the Olympics logo. I address this to you trusting that you will forward it to the appropriate person in IOC to respond to my inquiries.

**Background**

In 2013, the Omega Watch Company solicited Mr. Sukumar to purchase a special edition stopwatch manufactured by Omega. The limited-Edition stopwatch celebrated Omega's affiliation with the Olympic Games, and commemorated the 1932 Olympics. It was one in a collection of three (all in different shades of gold). The cost of the stopwatch at the time was approximately $110,000.00.

Mr. Sukumar attended the 1964 Olympic Games in Tokyo with his father and he has very fond and nostalgic memories of that experience. Those intimate feelings, and its connection to the Olympic Games, have resided with Mr. Sukumar for many years. Omega's website boasts of its connection to the Olympic Games: "On 27 occasions since 1932, Omega has fulfilled the role of the official Timekeeper at the Olympic Games." Omega touts that in 1932, the Sports Technical director of the Olympics, William Henry, wrote, "[i]t is impossible to contemplate the wonderfully successful Olympic Games without recognizing the part played by OMEGA in this great international event." Omega's website further states that "[a] great partnership had begun" after the 1932 Olympic Games.

Based on Mr. Sukumar's deep connection with the Olympic Games and Omega's long-standing and highly public partnership with the Olympics, Mr. Sukumar communicated a

October 30, 2019
Page 2

willingness to purchase the special edition Olympic stopwatch if Omega agreed to include certain custom engravings on the watch, including the Olympic Rings and the Omega logo, as well as a custom designed protective leather "pouch" for the watch and custom ribbons, all bearing the Olympic Rings and Omega logo. Mr. Sukumar desired a custom pouch that would allow him to actually operate the stopwatch while it was in the pouch (as opposed to the standard pouch provided by Omega that was only for storage).

Omega initially approved the requested customization and Mr. Sukumar put down a deposit for the stopwatch. Later, however, Omega informed Mr. Sukumar that it could not provide the requested customization of the stopwatch, pouch and ribbons. Accordingly, Mr. Sukumar declined to purchase the special edition stopwatch, and Omega returned the deposit.

Omega thereafter reversed course again and agreed to include the customization sought by Mr. Sukumar. In early 2014, based upon Omega's promise to include the customization, including engraving the Olympic Rings on the stopwatch and imprinting the Olympic Rings on the custom pouch and the custom ribbons, Mr. Sukumar purchased the Olympic stopwatch in red (Rose) gold.

During the first half of 2014, Mr. Sukumar and Omega worked on the customization of the Olympic stopwatch and the supporting pouch and ribbons. From the beginning, the renderings and mock-ups of the planned customization work included Olympic Rings on the special edition stopwatch and on the custom pouch and ribbons.

In February 2014, Omega delivered the engraved special edition red gold Olympic stopwatch to Mr. Sukumar. Among other things, the engravings included the Olympic Rings and the Omega logo. At that time, Omega was still working on delivering prototypes of the customized pouch and ribbons.

Later in 2014, in reliance on Omega's representation that it could and would provide the requested customization, including customized pouches and ribbons with the Olympic Rings, Mr. Sukumar purchased two additional commemorative replica gold Olympic stopwatches (one in white gold and the other in yellow gold). The total purchase price for the three stopwatches, including taxes, was slightly over $350,000.

The two additional special edition stopwatches purchased by Mr. Sukumar also included customized engraving and customized pouches and ribbons. The customization of the two additional stopwatches, with the accompanying customized pouches and ribbons, all were to include the Olympic Rings and the Omega logo. And, in fact, Omega delivered the white gold and yellow gold special edition stopwatches to Mr. Sukumar with the requested engraving, including the Olympic Rings and Omega logo. (Photos of the Olympic Rings on Mr. Sukumar's special edition stopwatches are attached as Exhibit "1.")

In June 2014, Mr. Sukumar met personally with several representatives of Omega, including Brice Le Troadec, the President of Omega USA, and Jean-Claude Monachon, the International Vice President of Product Development for Omega. The purpose of the meeting,

October 30, 2019
Page 3

which took place in San Diego, California, was twofold.  First, Omega wanted to market
specialty timepieces to Mr. Sukumar.  Second, Omega wanted to meet with Mr. Sukumar to
work on the details of the customization of the pouch and ribbons for the three special edition
Olympic stopwatches.  At the meeting, Mr. Sukumar explained to the Omega representatives his
strong feelings about the Olympic Games and Omega's connection to the Olympics.  Mr.
Sukumar detailed the need for the pouches and ribbons to be functional (so he could operate the
stopwatches while in the pouches).  Mr. Sukumar also reiterated the critical requirement that the
pouches and ribbons include the Olympic Rings and the Omega logo.

During that June 2014 meeting in San Diego, the issue came up regarding Omega's
authorization to imprint the Olympic Rings on the custom pouches and custom ribbons.  Jean-
Claude Monachon indicated that Omega would need to get International Olympic Committee
("IOC") approval to include the Olympic Rings on the custom pouches and ribbons.  Brice Le
Troadec, president of Omega USA,  responded that was not an issue because Omega had either
already received that authorization from the IOC or Omega could get authorization from the IOC
to include the Olympic Rings on the custom pouches and ribbons.  Implicit in that discussion
was the understanding that Omega had already received authorization from the IOC to engrave
the Olympic Rings on the special edition red gold Olympic stopwatch previously delivered to
Mr. Sukumar, as well as the white gold and yellow gold special edition Olympic stopwatches
Mr. Sukumar had also purchased.

Following the June 2014 San Diego meeting, Omega prepared modified specification
documents regarding the customized pouches and ribbons.  Those modified documents were
based on the discussions and consensus that occurred at the San Diego meeting.

During the latter part of 2014 and into 2015, Mr. Sukumar exchanged communications
with Omega regarding the requested customized pouches and ribbons for the stopwatches.
Those communications included specification documents, and Omega prepared several sets of
prototypes of the pouches and ribbons.  The specification documents and the renderings and all
prototypes of the pouches and ribbons included the Olympic Rings and the Omega logo.

The Olympic Rings on the custom pouches were imprinted at different locations on the
pouches and interspersed with the Omega log.  (Photos of the Olympic Rings on the custom
pouches are attached as Exhibit "2")  The custom ribbons were designed in the horizontal
saffron/white/green colors of the Indian flag, with the Olympic Rings imprinted in the middle
and alternating with the Ashoka Chakra wheel symbol of the Indian flag.  (Photos of the
Olympic Rings on the custom ribbons are attached as Exhibit "3")

In May 2015, Omega delivered a prototype of the pouches.  That prototype was not
satisfactory, and photos and specifications were marked up by Omega and Mr. Sukumar in
August 2015 with respect to needed revisions to the pouches and ribbons.

In December 2015, Omega delivered a revised prototype of the custom pouches, along
with prototypes of the custom ribbons.  Mr. Sukumar personally met with a representative of
Omega.  The parties reviewed the pouch prototype, which included imprinting of both the
Olympic Rings and the Omega logo, and Mr. Sukumar approved the pouch. Omega then

October 30, 2019
Page 4

represented that it would manufacture two additional duplicates of the approved pouch and deliver three custom pouches to Mr. Sukumar, as agreed, so that he would have a customized pouch for each of the three Olympic stopwatches he purchased from Omega.

At the December 2015 meeting, the Omega representative acknowledged that prototype ribbons prepared by Omega had, among other things, printing and ink color defects that needed to be corrected. Yet, other than the specifically identified defects, the prototype ribbons (which included the Olympic Rings and the Omega logo) were acceptable to Mr. Sukumar.

In early 2016, Omega attempted to replicate the custom pouch that Mr. Sukumar had approved. Omega itself, however, acknowledged the resulting pouch was not satisfactory, and that pouch was sent back for further reworking. Importantly, Omega has confirmed that the custom pouches and ribbons were outsourced to a third-party vendor for manufacture and customization, including imprinting the Olympic Rings on those items.

In May 2016, Omega shipped the "final" pouches and ribbons to its San Diego boutique store for delivery to Mr. Sukumar. Those pouches and ribbons contained numerous defects which were memorialized and itemized in a May 18, 2016 written report by an Omega representative. That defect report was prepared by the same Omega representative who met with Mr. Sukumar in December 2015 and, at that time, went over in detail the pouch prototype that Mr. Sukumar approved and the ribbons that contained some defects that required correction.

The May 18, 2016 report detailed the deficiencies in the custom pouches and ribbons which Omega was classifying as the "final" versions. With respect to the custom pouches, Mr. Sukumar had approved the pouch prototype in December 2015. Unfortunately, as confirmed by the Omega representative who prepared the May 18, 2016 report, Omega wholly failed to duplicate the approved prototype pouch and the "final" versions of the pouches that Omega intended to deliver to Mr. Sukumar contained a fair number of defects. With respect to the custom ribbons, the "final" versions contained the same defects that had been identified at the December 2015 meeting – the same defects that Omega agreed to correct.

Despite the defective nature of the custom pouches and ribbons, and despite the written report confirming the defective nature of those items, in late October 2016, Omega delivered its "final" version of the pouches and ribbons to Mr. Sukumar. In the subsequent litigation, the Omega representative who prepared the May 18, 2016 report testified that he knew the "final" versions of the custom pouches and ribbons that Omega delivered would not be acceptable to Mr. Sukumar because (i) the pouches did not match the prototype Mr. Sukumar had approved and the delivered pouches contained numerous defects; and (ii) Omega had not corrected the previously identified problems with the prototype ribbons. Indeed, the Omega representative admitted under oath that the "final" pouches and ribbons delivered to Mr. Sukumar did not meet Omega's quality standards.

Following receipt of the pouches and ribbons from Omega, Mr. Sukumar arranged for an expert in high-end jewelry accessories and leather goods to inspect the pouches and ribbons and provide analysis regarding the quality and workmanship of the Omega pouches and ribbons and the fitness of those items for the intended purpose.

October 30, 2019
Page 5

The initial analysis from the expert indicated there were issues with the pouches and ribbons that needed to be addressed and corrected. The expert opined, however, that it appeared those issues can be reasonably resolved. Along that line, the expert requested that Omega provide Mr. Sukumar with the prototypes/prior versions of the pouches and ribbons, as well as all renderings regarding the pouches and ribbons, so that the expert could review those items, complete her analysis, and put together a plan of action to resolve the outstanding issues.

Unfortunately, Omega declined to participate further in discussions aimed at informally resolving that matter. As a result, Mr. Sukumar was forced to initiate litigation to pursue an acceptable resolution with Omega.

As detailed above, a material aspect of Mr. Sukumar's purchase of the three special edition Olympic stopwatches from Omega was that the watches be engraved with, among other things, the Olympic Rings, and that Omega provide custom pouches and ribbons for the stopwatches that included imprinting with the Olympic Rings.

During the course of the litigation with Omega, which is still ongoing, Mr. Sukumar has propounded discovery to Omega seeking documentation confirming the IOC authorized Omega to engrave the Olympic Rings on the three special edition Olympic stopwatches that Mr. Sukumar purchased. Discovery was also sent to Omega seeking documentation confirming the IOC authorized Omega to imprint the Olympic Rings on the custom pouches and ribbons that were a material part of Mr. Sukumar's purchase of the three stopwatches. To date, Omega has failed and refused to produce any documentation establishing its authorization to include the Olympic Rings on the stopwatches, pouches and ribbons.

Mr. Sukumar and Omega have also engaged in settlement talks in the course of the litigation. During those discussions, Mr. Sukumar reiterated his desire and commitment to commissioning someone to design and manufacture custom pouches and ribbons for the three Olympic stopwatches he purchased from Omega. As noted, Mr. Sukumar has very strong and positive feelings for the Olympic Games and Omega's partnership with the Olympics. Mr. Sukumar proposed that he would be responsible, financially and otherwise, for obtaining the custom pouches and ribbons. Mr. Sukumar's request in that regard was that Omega permit him a one-time use of the Omega logo and the Olympic Rings for use on the custom pouches/ribbons he would commission. Mr. Sukumar's use of those symbols would be consistent with their use on the previously designed custom pouches and ribbons already approved by Omega.

Omega rejected Mr. Sukumar's proposal that he take responsibility for obtaining the custom pouches and ribbons. Omega's explanation for its rejection was, in part, that "Omega does not have the authority under its license to authorize a third-party to use Olympic IP, and cannot therefore authorize Mr. Sukumar to use the Olympic Rings or IOC intellectual property."

Omega's explanation is confusing. As noted, Omega has acknowledged that it outsourced the manufacture of Mr. Sukumar's custom pouches and ribbons, which included use of the Olympic Rings, to a third-party vendor. It is unclear as to why, if Omega was authorized to allow the third-party vendor to use the IOC intellectual property on the previously-produced-

October 30, 2019
Page 6

but-defective pouches and ribbons for the 3 special edition Olympic stopwatches, that same authorization could not be extended to Mr. Sukumar in connection with the very same project – custom pouches and ribbons for the three stopwatches. Indeed, Mr. Sukumar even offered to use the same third-party vendor the previously worked on the subject pouches and ribbons on behalf of Omega.

Given the foregoing conduct of Omega, Mr. Sukumar is now concerned that Omega did not have the International Olympic Committee's authority to utilize the Olympic Rings in the manner in which it promised to do so (i.e., engraving on the three stopwatches and imprinting on the custom pouches and ribbons). And, as noted, Mr. Sukumar is currently in possession of the 3 special edition Olympic stopwatches, with engraving that includes the Olympic Rings. The propriety of that engraving is now an open question.

<u>Requests</u>

• Please advise the extent to which Omega had the legal right to utilize the International Olympic Committee's "marks" on the three special edition stopwatches.

• Please advise the extent to which Omega had the legal right to produce custom accompanying pouches and ribbons to Mr. Sukumar that utilized the International Olympic Committee's "marks."

• Please advise the extent to which Omega had the legal right engage a third-party vendor to produce custom accompanying pouches and ribbons to Mr. Sukumar that utilized the International Olympic Committee's "marks."

• Please advise the extent to which Mr. Sukumar presently has the legal right engage a third-party vendor to produce custom accompanying pouches and ribbons that utilize the International Olympic Committee's "marks."

• Please provide me, as Mr. Sukumar's representative, with the documentation(s) granting Omega, it third-party vendor, and/or Mr. Sukumar the legal right to utilize the International Olympic Committee's "marks on the three special edition stopwatches, the custom pouches, and/or the custom ribbons.

Thank you for your anticipated courtesy in reply.

Very truly yours,

William J. Pinilis

WJP/js

October 30, 2019
Page 7


cc:    Mr. Ponani Sukumar -- *VIA* EMAIL
        Martin Mullen, Esq. -- *VIA* EMAIL

# EXHIBIT "1"

# EXHIBIT "1"

SGUS000002



 



तत् त्वं असि

 

अहं ब्रह्मास्मि

OMEGA   03.03.2014

SGUS000005

# EXHIBIT "2"

# EXHIBIT "2"

SGUS000338



SGUS0000344





# EXHIBIT "3"

EXHIBIT "3"

SGUS000339



EXHIBIT

"B"

# ROWE | MULLEN LLP

ATTORNEYS AT LAW
3636 Nobel Drive, Suite 215
San Diego, CA 92122
Phone: (858) 404-9800 | Fax: (858) 404-9833 | www.rowemullen.com

Martin J. Mullen | Direct Dial: (858) 450-2205 | Email: mullen@rowemullen.com

30918-2

January 7, 2021

**Via Federal Express**

Thomas Bach, Esq.
President of International Olympic Committee
INTERNATIONAL OLYMPIC COMMITTEE
Case Postal 356
1007 Lausanne
Switzerland

Anita L. DeFrantz, Esq.
Vice President of International Olympic Committee
Member IOC Legal Affairs
736 Raymond Avenue
Santa Monica, California 90405

**Re:   Ponani Sukumar v. The Swatch Group (U.S.) Inc**
**Ponani Sukumar v. International Olympic Committee**

Dear Mr. Bach and Ms. DeFrantz:

This office represents Ponani Sukumar in his ongoing dispute with the Omega Watch Company ("Omega") surrounding the design and sale of three commemorative, special edition stopwatches, each with its own customized ribbon and leather pouch, all bearing custom engraving, lettering or embossing, which included the iconic Olympic rings logo.

An October 30, 2019 letter was sent to you as President of the International Olympic Committee ("IOC") from Mr. Sukumar's New Jersey attorney, William J. Pinilis. (A copy of the October 30, 2019 letter is attached as **Exhibit "A."**) That letter requested certain information from the IOC as to the licensing rights of Omega to use the IOC's "marks," including any authority held by Omega to engage third-party vendors to produce custom ribbons and pouches containing those "marks." Unfortunately, there was no response from the IOC and no cooperation from Omega, which has forced Mr. Sukumar to consider additional legal remedies in an attempt to simply receive the goods for which he paid substantial money. We hope that through this correspondence, the IOC will honor Mr. Sukumar's request for information, which would obviate the need for him to go forward with claims against the IOC in federal court in the United States.

00239037.DOCX

Thomas Bach, Esq.
Anita L. DeFrantz, Esq.
January 7, 2021
Page 2


The details of the underlying transaction and subsequent litigation were detailed in the October 30, 2020 letter from Mr. Pinilis. (A copy of that October 30, 2019 letter is enclosed for your reference.) However, we wish to remind you of the key facts and the attempts to solve this dispute. Mr. Sukumar was solicited by Omega to purchase three gold limited edition stopwatches commemorating the 1932 Olympic Games, at a total cost of over $350,000. Included with the purchase were custom ribbons and leather pouches to be used while operating the watches. The watches were to be custom engraved, which included the IOC's marks, more specifically, the iconic Olympic rings logo. The ribbons and leather pouches were to be custom marked and embossed, respectively, also including the Olympic logo. Omega, as the official timekeeper of the Olympic games since 1932, represented to Mr. Sukumar on multiple occasions that it had express authorization from the IOC to place the Olympic logos on the watches, ribbons and pouches. It was clearly understood by all that Mr. Sukumar was only interested in the watches, ribbons and pouches if they met certain specifications (including the Olympic logo) authorized by Mr. Sukumar and agreed to by Omega.

Mr. Sukumar received the three watches, which included the engraved Olympic logos, however the ribbon and pouches were not in conformity with the specifications provided by Omega and approved by Mr. Sukumar. Having paid more than $350,000 for the watches, ribbons and pouches, Mr. Sukumar was rightfully adamant in requesting conformity with the written specifications and even hired, at his own expense, an expert designer to identify with particularity, the deficiencies in the design and production of the ribbons and pouches and provide a proposed action plan to remedy those deficiencies. Omega, however, ignored the expert's findings, refused to correct the deficiencies and refused to offer a refund.

After litigation was commenced, Omega admitted, under oath that the ribbons and pouches were not in conformity with the written specifications. Even more troubling was that Omega was unwilling or unable to produce any documentation of its purported authorization to use the Olympic logo on the watches, ribbons and pouches. Nevertheless, in an effort to settle the dispute, Mr. Sukumar offered to commission a third party to design and manufacture the ribbons and pouches and all Omega had to do was grant a one-time use of Omega's logo and the Olympic rings. Omega refused the offer claiming it lacked the authority to authorize a third-party use of the Olympic logo. Interestingly, Omega has admitted it outsourced the production of the ribbons and pouches to a third-party vendor, which is inconsistent with its assertion that it lacked authority to authorize a third-party use of the Olympic logo. Mr. Sukumar then offered to use the same third-party vendor that Omega had used to produce the original prototypes of the custom pouches and ribbons, who presumably had authorization to use the Olympic logo. Omega refused that offer.

Understandably, Omega's refusal to document it licensing rights with the IOC, and Omega's inconsistent positions regarding its ability to hire third-party vendors to produce products containing the Olympic logo, brings into question whether Olympic logos on the watches, pouches

Thomas Bach, Esq.
Anita L. DeFrantz, Esq.
January 7, 2021
Page 3

and ribbons in Mr. Sukumar's possession contain engraving consistent with an authorized use of
the Olympic logo. There is also a question as to whether Omega had/has authority from the IOC
to include the Olympic rings on the custom pouches and ribbons that were part of the original
agreement between Mr. Sukumar and Omega.  In deference to the IOC's right to protect its
universally recognized marks, Mr. Sukumar has made every reasonable effort to get clarification
of Omega's licensing rights to the Olympic logo, with the ultimate goal of only receiving the
product that he contracted and paid for.

Omega has been uncooperative, and that is why attorney Pinilis sent his October 30, 2019
letter to the IOC seeking clarification of rights with respect to the Olympic "marks."
Unfortunately, the IOC did not respond to that written request from Mr. Sukumar's attorney.  It
therefore appears that Mr. Sukumar is left with no option but to seek court intervention to obtain
clarity on this issue.  Please find attached as **Exhibit "B"** the draft Complaint for Declaratory
Relief against the IOC seeking a judicial declaration which is necessary and appropriate under the
circumstances so the parties may ascertain their rights and duties with respect to the use of the
Olympic logo on the watches, ribbons and pouches.  This litigation will come at a substantial
expense of time and resources to all parties involved.  However, absent an informal resolution with
Omega and/or the IOC with respect to use of the IOC's intellectual property, Mr. Sukumar is left
with no choice.

As an alternative to formal court action, Mr. Sukumar reiterates his request that the IOC
provide the information and documentation set forth in the October 30, 2019 letter from attorney
William J. Pinilis.  That would eliminate the need to engage in protracted and expensive litigation.
As a reminder, the information and documentation sought by Mr. Sukumar includes:

- The extent to which Omega had the legal right to utilize the International Olympic
  Committee's "marks" on the three special edition stopwatches.

- The extent to which Omega had the legal right to produce custom accompanying
  pouches and ribbons to Mr. Sukumar that utilized the International Olympic
  Committee's "marks.""

- The extent to which Omega had the legal right to engage a third-party vendor to
  produce custom accompanying pouches and ribbons to Mr. Sukumar that utilized
  the International Olympic Committee's "marks."

- The extent to which Mr. Sukumar presently has the legal right engage a third-party
  vendor to produce custom accompanying pouches and ribbons that utilize the
  International Olympic Committee's "marks."

00239037.DOCX

Thomas Bach, Esq.
Anita L. DeFrantz, Esq.
January 7, 2021
Page 4

- Documentation granting Omega, and/or its third-party vendor, and/or Mr. Sukumar the legal right to utilize the International Olympic Committee's "marks" on the three special edition stopwatches, the custom pouches, and/or the custom ribbons.

Mr. Sukumar is willing to agree, in writing, that any information from the IOC with respect to its licensing rights or agreements will be kept strictly confidential and will only be used to complete the production of the ribbons and pouches

I and my client earnestly seek resolution of these issues without the need for litigation, and I trust your lack of response to Mr. Pinilis' letter was an innocent oversight. I will make myself available at your convenience to address your timely response to this letter.

Please let us know by January 25, 2021 if the IOC will provide the requested information. Absent a response from the IOC by that date, Mr. Sukumar will be forced move forward with his Complaint for Declaratory Relief.

I thank you in advance for your kind attention to this matter and I look forward to speaking soon with an appropriate representation of the IOC.

Very truly yours,

Martin J. Mullen
ROWE | MULLEN LLP

cc: Ponani Sukumar

00239037.DOCX

# EXHIBIT "A"

# EXHIBIT "A"



William J. Pinilis
WPinilis@ConsumerFraudLawyer.com
Certified by the Supreme Court of New Jersey as a Civil Trial Attorney

October 30, 2019

<u>*VIA* **FEDERAL EXPRESS**</u>
Thomas Bach, Esq.
President of International Olympic Committee
INTERNATIONAL OLYMPIC COMMITTEE
Case Postale 356
1007 Lausanne
Switzerland

      Re:    Ponani Sukumar v. The Swatch Group (U.S.) Inc.
              Docket No. ESX-L-1411-18
              File No. 12140

Dear Mr. Bach:

This office represents an individual in the United States, Ponani Sukumar. The subject matter of this correspondence concerns my client's use of the Olympics logo. I address this to you trusting that you will forward it to the appropriate person in IOC to respond to my inquiries.

**Background**

In 2013, the Omega Watch Company solicited Mr. Sukumar to purchase a special edition stopwatch manufactured by Omega. The limited-Edition stopwatch celebrated Omega's affiliation with the Olympic Games, and commemorated the 1932 Olympics. It was one in a collection of three (all in different shades of gold). The cost of the stopwatch at the time was approximately $110,000.00.

Mr. Sukumar attended the 1964 Olympic Games in Tokyo with his father and he has very fond and nostalgic memories of that experience. Those intimate feelings, and its connection to the Olympic Games, have resided with Mr. Sukumar for many years. Omega's website boasts of its connection to the Olympic Games: "On 27 occasions since 1932, Omega has fulfilled the role of the official Timekeeper at the Olympic Games." Omega touts that in 1932, the Sports Technical director of the Olympics, William Henry, wrote, "[i]t is impossible to contemplate the wonderfully successful Olympic Games without recognizing the part played by OMEGA in this great international event." Omega's website further states that "[a] great partnership had begun" after the 1932 Olympic Games.

Based on Mr. Sukumar's deep connection with the Olympic Games and Omega's long-standing and highly public partnership with the Olympics, Mr. Sukumar communicated a

October 30, 2019
Page 2

willingness to purchase the special edition Olympic stopwatch if Omega agreed to include certain custom engravings on the watch, including the Olympic Rings and the Omega logo, as well as a custom designed protective leather "pouch" for the watch and custom ribbons, all bearing the Olympic Rings and Omega logo. Mr. Sukumar desired a custom pouch that would allow him to actually operate the stopwatch while it was in the pouch (as opposed to the standard pouch provided by Omega that was only for storage).

Omega initially approved the requested customization and Mr. Sukumar put down a deposit for the stopwatch. Later, however, Omega informed Mr. Sukumar that it could not provide the requested customization of the stopwatch, pouch and ribbons. Accordingly, Mr. Sukumar declined to purchase the special edition stopwatch, and Omega returned the deposit.

Omega thereafter reversed course again and agreed to include the customization sought by Mr. Sukumar. In early 2014, based upon Omega's promise to include the customization, including engraving the Olympic Rings on the stopwatch and imprinting the Olympic Rings on the custom pouch and the custom ribbons, Mr. Sukumar purchased the Olympic stopwatch in red (Rose) gold.

During the first half of 2014, Mr. Sukumar and Omega worked on the customization of the Olympic stopwatch and the supporting pouch and ribbons. From the beginning, the renderings and mock-ups of the planned customization work included Olympic Rings on the special edition stopwatch and on the custom pouch and ribbons.

In February 2014, Omega delivered the engraved special edition red gold Olympic stopwatch to Mr. Sukumar. Among other things, the engravings included the Olympic Rings and the Omega logo. At that time, Omega was still working on delivering prototypes of the customized pouch and ribbons.

Later in 2014, in reliance on Omega's representation that it could and would provide the requested customization, including customized pouches and ribbons with the Olympic Rings, Mr. Sukumar purchased two additional commemorative replica gold Olympic stopwatches (one in white gold and the other in yellow gold). The total purchase price for the three stopwatches, including taxes, was slightly over $350,000.

The two additional special edition stopwatches purchased by Mr. Sukumar also included customized engraving and customized pouches and ribbons. The customization of the two additional stopwatches, with the accompanying customized pouches and ribbons, all were to include the Olympic Rings and the Omega logo. And, in fact, Omega delivered the white gold and yellow gold special edition stopwatches to Mr. Sukumar with the requested engraving, including the Olympic Rings and Omega logo. (Photos of the Olympic Rings on Mr. Sukumar's special edition stopwatches are attached as Exhibit "1.")

In June 2014, Mr. Sukumar met personally with several representatives of Omega, including Brice Le Troadec, the President of Omega USA, and Jean-Claude Monachon, the International Vice President of Product Development for Omega. The purpose of the meeting,

October 30, 2019
Page 3

which took place in San Diego, California, was twofold. First, Omega wanted to market specialty timepieces to Mr. Sukumar. Second, Omega wanted to meet with Mr. Sukumar to work on the details of the customization of the pouch and ribbons for the three special edition Olympic stopwatches. At the meeting, Mr. Sukumar explained to the Omega representatives his strong feelings about the Olympic Games and Omega's connection to the Olympics. Mr. Sukumar detailed the need for the pouches and ribbons to be functional (so he could operate the stopwatches while in the pouches). Mr. Sukumar also reiterated the critical requirement that the pouches and ribbons include the Olympic Rings and the Omega logo.

During that June 2014 meeting in San Diego, the issue came up regarding Omega's authorization to imprint the Olympic Rings on the custom pouches and custom ribbons. Jean-Claude Monachon indicated that Omega would need to get International Olympic Committee ("IOC") approval to include the Olympic Rings on the custom pouches and ribbons. Brice Le Troadec, president of Omega USA, responded that was not an issue because Omega had either already received that authorization from the IOC or Omega could get authorization from the IOC to include the Olympic Rings on the custom pouches and ribbons. Implicit in that discussion was the understanding that Omega had already received authorization from the IOC to engrave the Olympic Rings on the special edition red gold Olympic stopwatch previously delivered to Mr. Sukumar, as well as the white gold and yellow gold special edition Olympic stopwatches Mr. Sukumar had also purchased.

Following the June 2014 San Diego meeting, Omega prepared modified specification documents regarding the customized pouches and ribbons. Those modified documents were based on the discussions and consensus that occurred at the San Diego meeting.

During the latter part of 2014 and into 2015, Mr. Sukumar exchanged communications with Omega regarding the requested customized pouches and ribbons for the stopwatches. Those communications included specification documents, and Omega prepared several sets of prototypes of the pouches and ribbons. The specification documents and the renderings and all prototypes of the pouches and ribbons included the Olympic Rings and the Omega logo.

The Olympic Rings on the custom pouches were imprinted at different locations on the pouches and interspersed with the Omega log. (Photos of the Olympic Rings on the custom pouches are attached as Exhibit "2") The custom ribbons were designed in the horizontal saffron/white/green colors of the Indian flag, with the Olympic Rings imprinted in the middle and alternating with the Ashoka Chakra wheel symbol of the Indian flag. (Photos of the Olympic Rings on the custom ribbons are attached as Exhibit "3")

In May 2015, Omega delivered a prototype of the pouches. That prototype was not satisfactory, and photos and specifications were marked up by Omega and Mr. Sukumar in August 2015 with respect to needed revisions to the pouches and ribbons.

In December 2015, Omega delivered a revised prototype of the custom pouches, along with prototypes of the custom ribbons. Mr. Sukumar personally met with a representative of Omega. The parties reviewed the pouch prototype, which included imprinting of both the Olympic Rings and the Omega logo, and Mr. Sukumar approved the pouch. Omega then

October 30, 2019
Page 4

represented that it would manufacture two additional duplicates of the approved pouch and deliver three custom pouches to Mr. Sukumar, as agreed, so that he would have a customized pouch for each of the three Olympic stopwatches he purchased from Omega.

At the December 2015 meeting, the Omega representative acknowledged that prototype ribbons prepared by Omega had, among other things, printing and ink color defects that needed to be corrected. Yet, other than the specifically identified defects, the prototype ribbons (which included the Olympic Rings and the Omega logo) were acceptable to Mr. Sukumar.

In early 2016, Omega attempted to replicate the custom pouch that Mr. Sukumar had approved. Omega itself, however, acknowledged the resulting pouch was not satisfactory, and that pouch was sent back for further reworking. Importantly, Omega has confirmed that the custom pouches and ribbons were outsourced to a third-party vendor for manufacture and customization, including imprinting the Olympic Rings on those items.

In May 2016, Omega shipped the "final" pouches and ribbons to its San Diego boutique store for delivery to Mr. Sukumar. Those pouches and ribbons contained numerous defects which were memorialized and itemized in a May 18, 2016 written report by an Omega representative. That defect report was prepared by the same Omega representative who met with Mr. Sukumar in December 2015 and, at that time, went over in detail the pouch prototype that Mr. Sukumar approved and the ribbons that contained some defects that required correction.

The May 18, 2016 report detailed the deficiencies in the custom pouches and ribbons which Omega was classifying as the "final" versions. With respect to the custom pouches, Mr. Sukumar had approved the pouch prototype in December 2015. Unfortunately, as confirmed by the Omega representative who prepared the May 18, 2016 report, Omega wholly failed to duplicate the approved prototype pouch and the "final" versions of the pouches that Omega intended to deliver to Mr. Sukumar contained a fair number of defects. With respect to the custom ribbons, the "final" versions contained the same defects that had been identified at the December 2015 meeting – the same defects that Omega agreed to correct.

Despite the defective nature of the custom pouches and ribbons, and despite the written report confirming the defective nature of those items, in late October 2016, Omega delivered its "final" version of the pouches and ribbons to Mr. Sukumar. In the subsequent litigation, the Omega representative who prepared the May 18, 2016 report testified that he knew the "final" versions of the custom pouches and ribbons that Omega delivered would not be acceptable to Mr. Sukumar because (i) the pouches did not match the prototype Mr. Sukumar had approved and the delivered pouches contained numerous defects; and (ii) Omega had not corrected the previously identified problems with the prototype ribbons. Indeed, the Omega representative admitted under oath that the "final" pouches and ribbons delivered to Mr. Sukumar did not meet Omega's quality standards.

Following receipt of the pouches and ribbons from Omega, Mr. Sukumar arranged for an expert in high-end jewelry accessories and leather goods to inspect the pouches and ribbons and provide analysis regarding the quality and workmanship of the Omega pouches and ribbons and the fitness of those items for the intended purpose.

October 30, 2019
Page 5

The initial analysis from the expert indicated there were issues with the pouches and ribbons that needed to be addressed and corrected. The expert opined, however, that it appeared those issues can be reasonably resolved. Along that line, the expert requested that Omega provide Mr. Sukumar with the prototypes/prior versions of the pouches and ribbons, as well as all renderings regarding the pouches and ribbons, so that the expert could review those items, complete her analysis, and put together a plan of action to resolve the outstanding issues.

Unfortunately, Omega declined to participate further in discussions aimed at informally resolving that matter. As a result, Mr. Sukumar was forced to initiate litigation to pursue an acceptable resolution with Omega.

As detailed above, a material aspect of Mr. Sukumar's purchase of the three special edition Olympic stopwatches from Omega was that the watches be engraved with, among other things, the Olympic Rings, and that Omega provide custom pouches and ribbons for the stopwatches that included imprinting with the Olympic Rings.

During the course of the litigation with Omega, which is still ongoing, Mr. Sukumar has propounded discovery to Omega seeking documentation confirming the IOC authorized Omega to engrave the Olympic Rings on the three special edition Olympic stopwatches that Mr. Sukumar purchased. Discovery was also sent to Omega seeking documentation confirming the IOC authorized Omega to imprint the Olympic Rings on the custom pouches and ribbons that were a material part of Mr. Sukumar's purchase of the three stopwatches. To date, Omega has failed and refused to produce any documentation establishing its authorization to include the Olympic Rings on the stopwatches, pouches and ribbons.

Mr. Sukumar and Omega have also engaged in settlement talks in the course of the litigation. During those discussions, Mr. Sukumar reiterated his desire and commitment to commissioning someone to design and manufacture custom pouches and ribbons for the three Olympic stopwatches he purchased from Omega. As noted, Mr. Sukumar has very strong and positive feelings for the Olympic Games and Omega's partnership with the Olympics. Mr. Sukumar proposed that he would be responsible, financially and otherwise, for obtaining the custom pouches and ribbons. Mr. Sukumar's request in that regard was that Omega permit him a one-time use of the Omega logo and the Olympic Rings for use on the custom pouches/ribbons he would commission. Mr. Sukumar's use of those symbols would be consistent with their use on the previously designed custom pouches and ribbons already approved by Omega.

Omega rejected Mr. Sukumar's proposal that he take responsibility for obtaining the custom pouches and ribbons. Omega's explanation for its rejection was, in part, that "Omega does not have the authority under its license to authorize a third-party to use Olympic IP, and cannot therefore authorize Mr. Sukumar to use the Olympic Rings or IOC intellectual property."

Omega's explanation is confusing. As noted, Omega has acknowledged that it outsourced the manufacture of Mr. Sukumar's custom pouches and ribbons, which included use of the Olympic Rings, to a third-party vendor. It is unclear as to why, if Omega was authorized to allow the third-party vendor to use the IOC intellectual property on the previously-produced-

October 30, 2019
Page 6

but-defective pouches and ribbons for the 3 special edition Olympic stopwatches, that same authorization could not be extended to Mr. Sukumar in connection with the very same project – custom pouches and ribbons for the three stopwatches.  Indeed, Mr. Sukumar even offered to use the same third-party vendor the previously worked on the subject pouches and ribbons on behalf of Omega.

Given the foregoing conduct of Omega, Mr. Sukumar is now concerned that Omega did not have the International Olympic Committee's authority to utilize the Olympic Rings in the manner in which it promised to do so (i.e., engraving on the three stopwatches and imprinting on the custom pouches and ribbons).  And, as noted, Mr. Sukumar is currently in possession of the 3 special edition Olympic stopwatches, with engraving that includes the Olympic Rings.  The propriety of that engraving is now an open question.

### Requests

• Please advise the extent to which Omega had the legal right to utilize the International Olympic Committee's "marks" on the three special edition stopwatches.

• Please advise the extent to which Omega had the legal right to produce custom accompanying pouches and ribbons to Mr. Sukumar that utilized the International Olympic Committee's "marks."

• Please advise the extent to which Omega had the legal right engage a third-party vendor to produce custom accompanying pouches and ribbons to Mr. Sukumar that utilized the International Olympic Committee's "marks."

• Please advise the extent to which Mr. Sukumar presently has the legal right engage a third-party vendor to produce custom accompanying pouches and ribbons that utilize the International Olympic Committee's "marks."

• Please provide me, as Mr. Sukumar's representative, with the documentation(s) granting Omega, it third-party vendor, and/or Mr. Sukumar the legal right to utilize the International Olympic Committee's "marks on the three special edition stopwatches, the custom pouches, and/or the custom ribbons.

Thank you for your anticipated courtesy in reply.

Very truly yours,

William J. Pinilis

WJP/js

October 30, 2019
Page 7


cc:      Mr. Ponani Sukumar – *VIA* **EMAIL**
         Martin Mullen, Esq. – *VIA* **EMAIL**

# EXHIBIT "1"

# EXHIBIT "1"

SGUS000002



 

तत् त्वं असि

 

अहं ब्रह्मास्मि

 03.03.2014

**SGUS000005**

# EXHIBIT "2"

# EXHIBIT "2"

SGUS000338



SGUS000344





# EXHIBIT "3"

# EXHIBIT "3"

SGUS000339



# EXHIBIT "B"

# EXHIBIT "B"

**ROWE | MULLEN LLP**
Martin Mullen (SBN 137974)
3636 Nobel Drive, Suite 215
San Diego, California 92122
Telephone:  (858) 404-9800
Facsimile:  (858) 404-9833

**FRIEDHOFER PC**
JAMES E. FRIEDHOFER (State Bar No. 144832)
11410 Bracken Fern Cove
San Diego, California 92131
Telephone:  (858) 693-4400
Facsimile:  (858) 693-8800

Attorneys for Plaintiff
PONANI SUKUMAR

### UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PONANI SUKUMAR, an individual, | Case No. |
| Plaintiff, | **COMPLAINT FOR DECLARATORY RELIEF** |
| v. | |
| INTERNATIONAL OLYMPIC COMMITTEE, an international non-profit, non-governmental organization; and DOES 1-20, inclusive, | |
| Defendants. | |

Plaintiff Ponani Sukumar alleges in support of his Complaint, as follows:

### PARTIES

1.     Plaintiff Ponani Sukumar (hereinafter "Plaintiff"), is now, and at all of the times in this complaint mentioned was, an individual residing in San Diego County, California.

///

1    2.    Plaintiff is informed and believes and thereon alleges that defendant

2  International Olympic Committee ("IOC") is an international non-profit, non-

3  governmental organization that is headquartered in Lausanne, Switzerland.  Plaintiff is

4  further informed and believes that defendant IOC organizes and oversees the modern

5  Olympic Games.

6    3.    Plaintiff is informed and believes that defendant IOC holds the rights to

7  the Olympic properties, including the iconic Olympic symbol consisting of the five

8  interlaced rings (the "Olympic Rings").  Plaintiff is further informed and believes that

9  use of the Olympic properties, including the Olympic Rings, can only occur with the

10  express, prior written consent of defendant IOC.

11    4.    The true names and capacities of defendants DOES 1 through 20,

12  inclusive, are unknown to Plaintiff, who, therefore, sues these defendants by their

13  fictitious names.  Plaintiff will seek leave to amend this Complaint to set forth their

14  true names and capacities when they have been ascertained.

15    5.    Plaintiff is informed and believes and thereon alleges that at all times

16  relevant hereto, DOES 1 through 20, inclusive, and each of them, were, and are now,

17  the agents and employees of each of the other defendants herein, and in doing the acts

18  alleged herein, were at all times acting within the course and scope of said agency and

19  employment, with the consent and at the direction of the other defendants.  Plaintiff is

20  informed and believes and thereon alleges that each of such fictitiously named

21  defendants is responsible in some manner for the occurrences alleged herein.

22  **JURISDICTION AND VENUE**

23    6.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

24    7.    Venue is proper in this judicial district pursuant to 28 U.S.C. 1391(b)(2).

25  **FACTUAL ALLEGATIONS**

26    8.    Upon information and belief, The Swatch Group (U.S.) Inc. operates as a

27  subsidiary of The Swatch Group AG, a Swiss business entity concentrating on the

28  manufacture of luxury timepieces, jewelry, and leather goods.

9.     Upon information and belief, The Swatch Group (U.S.) Inc., includes Omega USA and the Omega Retail Division, which is the operator of Omega retail boutique stores nationwide, including the Omega Boutique store in San Diego, California.  (The Swatch Group (U.S.) Inc., including Omega USA and the Omega Retail Division, are collectively hereinafter referred to as "Omega.")

10.     Plaintiff is a collector of Omega timepieces.  In 2013, Plaintiff was solicited by Omega to purchase a limited edition and collectible commemorative replica gold Olympic stopwatch. According to Omega's website, the stopwatch is a limited-edition replica of the original Olympic 1932 Rattrapante chronograph used as the official timekeeper of the Olympic Games in Los Angeles.

11.     The cost of the stopwatch was approximately $110,000.  The stopwatch came with a storage pouch.  Plaintiff made it clear to Omega that he was not interested in purchasing the stopwatch unless he could have certain custom engraving, and a high quality protective leather "pouch" with ribbons that would allow him to wear the watch around his neck.  Plaintiff inquired of Omega about the specialized engraving on the stopwatch, and also about Omega designing a custom storage pouch, and related ribbons, that would allow Plaintiff to actually wear and operate the stopwatch while it was in the pouch (as opposed to the standard pouch that was only for storage).

12.     The customization requested by Plaintiff for the Omega stopwatch and pouch and ribbons included the Olympic Rings.  Specifically, Plaintiff requested that the engraving on the stopwatch include the Olympic Rings and that the Olympic Rings also be embossed on the customized leather pouch and imprinted on the related customized ribbons.

13.     Omega initially indicated that it would fulfill the requested customization, including the placement of the Olympic Rings on the stopwatch, pouch and ribbons. Based upon Omega's agreement to do so, Plaintiff agreed to purchase the stopwatch, and paid a deposit toward the purchase.  Later, Omega determined that it was unwilling, or unable, to provide the customization. Plaintiff required the customization as a

precondition to purchasing. Thus, Omega returned the deposit. The transaction was cancelled.

14.   After apparently realizing that there were not enough (or any) other purchasers willing to buy these highly unique and costly watches, Omega agreed that it would meet Plaintiff's customization requirements, including the placement of the Olympic Rings on the stopwatch, pouch and ribbons.  To that end, Omega contacted Plaintiff and confirmed that it would both engrave the watch, and have what it describes on its website to be its "Fine Leather" division create the "pouch" and ribbons, again including placement of the Olympic Rings on the stopwatch, pouch and ribbons.

15.   Based upon Omega's promises to meet Plaintiff's specifications, Plaintiff purchased the Olympic stopwatch in red (Rose) gold.

16.   In further reliance upon Omega's representation that it would customize the stopwatches, including the creation of customized pouches and ribbons, all said customization to include the Olympic Rings, in July 2014 Plaintiff agreed to purchase two additional commemorative replica gold Olympic stopwatches (one in white gold and the other in yellow gold).   Specifically, all three stopwatches, along with customized pouches and ribbons for each, were to include the Olympic Rings.

17.   The total purchase price for the three (3) stopwatches, inclusive of the customization, and taxes, was more than $350,000.

18.   In addition to soliciting Plaintiff to purchase the stopwatches, Omega also solicited Plaintiff to purchase many other products. In connection with such solicitations, Omega specifically promised Plaintiff that Plaintiff would receive desirable "special benefits" if Plaintiff became one of Omega's "best customers." Omega specifically advertises that it has the "honour" of a special relationship with the Olympic Games.  Omega promised to use its special relationship to provide Plaintiff substantial special access to Olympic tickets, parties, and athletes.

19.   On its website, Omega boasts that "[o]n 27 occasions since 1932, Omega has fulfilled the role of Official Timekeeper at the Olympic Games." Omega touts that

in 1932, the Sports Technical Director of the Olympics, William Henry, wrote: "[i]t is impossible to contemplate the wonderfully successful Olympic Games without recognizing the part played by OMEGA in this great international event." Omega asserts that "[a] great partnership had begun" after the 1932 Olympic Games. Omega repeatedly told Plaintiff that it could leverage this longstanding relationship with the Olympics to provide him with the aforementioned access and benefits.

20.    Omega used its purported "great partnership" with the Olympics as a "come on" to induce Plaintiff to purchase the aforementioned stopwatches – which its website says are "enhanced replica[s] of a 1932 pocket chronograph – the very stopwatch that had timed the Los Angeles 1932 Olympic Games."

21.    Omega delivered the three stopwatches to Plaintiff with the requested customized engraving that included the Olympic Rings.

22.    Omega, however, was not able to satisfactorily provide the promised custom pouches and ribbons.   During 2013, 2014 and 2015, Plaintiff exchanged communications with Omega regarding the customized pouches and ribbons for the commemorative replica gold Olympic stopwatches.   Those communications included specification documents.   Unfortunately, when Omega delivered the special pouches and ribbons for the watches, those items were substandard and did not meet the specifications.

23.    Plaintiff attempted to pursue the informal resolution of the issues regarding the quality and workmanship of the pouches and ribbons, including obtaining a detailed description from an expert designer as to the specific deficiencies in the design and production and a proposed action plan to resolve those deficiencies.   Omega rejected those overtures and refused to honor its promises.   It has likewise refused to refund the purchase.

24.    Defendant IOC holds the rights to the Olympic Rings, which the IOC refers to as the "Olympic symbol."   As stated on the IOC website [www.olympic.org/olympic-rings]:

**LINK TO OLYMPIC PROPERTIES**
The Olympic rings are a cornerstone of the Olympic properties, which comprise a variety of assets: the Olympic symbol, flag, motto, anthem, identifications (including but not limited to "Olympic Games" and "Games of the Olympiad"), designations, emblems, flame and torches (...) may, for convenience be collectively or individually referred to as "Olympic properties".

**Use and Rights**
All rights to the Olympic properties, as well as all rights to the use thereof, belong exclusively to the IOC, including but not limited to the use of any profit making, commercial or advertising purposes.

The Olympic symbol and the Olympic properties must be used only with the express prior written consent of the IOC.

Guidelines are available to provide direction for the use of the Olympic symbol by the Olympic Movement and its authorised stakeholders. They aim to preserve the integrity and authority of the Olympic symbol while ensuring its visibility and inclusiveness.

25. During the course of the informal resolution communications between Plaintiff and Omega, Omega represented that it had authorization from the IOC to engrave the Olympic Rings on the three stopwatches delivered to Plaintiff. Omega further represented that it had authorization from the IOC for the Olympic Rings be embossed on the customized leather pouches and imprinted on the related customized ribbons. The prototype custom pouches and ribbons that Omega showed to Plaintiff, as well as the substandard "final" custom pouches and ribbons that Omegas delivered to Plaintiff, contained the Olympic Rings.

26. When an informal resolution between Plaintiff and Omega could not be reached, Plaintiff was forced to initiate a lawsuit against Omega in the New Jersey State Court (Case No. ESX-L001411-18) regarding the dispute over the stopwatches, pouches and ribbons. In connection with that case, which is currently pending, Plaintiff requested all documents evidencing the authorization Omega had received from the IOC regarding the placement of the Olympic Rings on Plaintiffs' stopwatches and custom pouches and ribbons. Omega was unwilling or unable to produce any

///

1   documentation supporting its authorization to include the Olympic Rings on Plaintiffs'
2   stopwatches and custom pouches and ribbons.

3       27.    Plaintiff and Omega also engaged in settlement discussions regarding the
4   dispute.  During those discussions, Plaintiff reiterated his desire and commitment to
5   commissioning someone to design and manufacture custom pouches and ribbons for
6   the three Olympic stopwatches purchased from Omega.  Plaintiff proposed that he take
7   responsibility for obtaining the custom pouches and ribbons.  In that regard, Plaintiff
8   requested that Omega permit Plaintiff a one-time use of the Omega logo and the
9   Olympic Rings for use on the custom pouches and ribbons Plaintiff would commission.
10  Plaintiff's use of the Omega logo and the Olympic Rings would be consistent with their
11  use on the previously designed custom pouches and ribbons already approved by
12  Omega, and purportedly approved by the IOC.

13      28.    Omega rejected Plaintiff's proposal that Plaintiff take responsibility for
14  obtaining the custom pouches and ribbons.  Omega's explanation for its rejection was,
15  in part, that "Omega does not have the authority under its license to authorize a third-
16  party to use Olympic IP and cannot therefore authorize Mr. Sukumar to use the Olympic
17  Rings or IOC intellectual property."

18      29.    Omega's explanation in that regard was inconsistent from its prior actions
19  with Plaintiff.  Omega had acknowledged that it outsourced the manufacture of
20  Plaintiff's custom pouches and ribbons, which included use of the Olympic Rings, to a
21  third-party vendor.  It is unclear as to why, if Omega was authorized to allow the third-
22  party vendor to use the IOC intellectual property on the previously-produced-but-
23  defective pouches and ribbons for the three special edition Olympic stopwatches, that
24  same authorization could not be extended to Plaintiff in connection with the very same
25  project – custom pouches and ribbons for the three stopwatches.  Indeed, Plaintiff even
26  offered to use the same third-party vendor that previously worked on the subject
27  pouches and ribbons on behalf of Omega.

28  ///

1       30.    When Plaintiff was unable to obtain from Omega written confirmation of

2   the scope of authorization, if any, granted by the IOC to Omega to include the Olympic

3   Rings on Plaintiffs' stopwatches and custom pouches and ribbons, and Plaintiff was

4   unable to get authorization from Omega for Plaintiff to take over responsibility for the

5   custom pouches and ribbons, Plaintiff sought to obtain the authorization information

6   directly from the IOC.  In an October 30, 2019 letter to the IOC, Plaintiff laid out the

7   history of his situation with Omega and the open questions regarding the use of the IOC

8   intellectual property on Plaintiffs' Omega stopwatches and custom pouches and

9   ribbons.  (A copy of the October 30, 2019 letter is attached as **Exhibit "A."**)

10       31.    Plaintiff received no response from the IOC to the October 30, 2019

11   inquiry.

12       32.    Plaintiff is currently in possession of the three customized Omega limited

13   edition and collectible commemorative replica gold Olympic stopwatches with

14   Olympic Rings engraved on each watch.  Plaintiff has concerns regarding the propriety

15   of the Olympic Rings Omega included on those watches.

16       33.    Plaintiff has also failed to receive from Omega the custom pouches and

17   ribbons that were a material term of the purchase of the three stopwatches.  As noted,

18   the agreed-upon specifications included embossing the Olympic Rings on the pouches

19   and imprinting the Olympic Rings on the ribbons.  Plaintiff has concerns regarding

20   Omega's authorization from the IOC for the Olympic Rings be embossed on the

21   customized leather pouches and imprinted on the related customized ribbons.  Plaintiff

22   also seeks clarification of the authority to include the Olympic Rings on any custom

23   pouches and ribbons that may be completed consistent with the original agreement

24   between Plaintiff and Omega.

25   ///

26   ///

27   ///

28   ///

## FIRST CAUSE OF ACTION

### (Declaratory Relief Against Defendant
### and DOES 1 through 20, inclusive)

34.    Plaintiff realleges and incorporate herein by reference paragraphs 1 through 33, inclusive, of this Complaint.

35.    An actual controversy has arisen and now exists between Plaintiff, on the one hand, and defendant IOC, on the other, concerning the respective rights and duties of Plaintiff. Omega and defendant IOC with respect to the use of the IOC intellectual property, including the Olympic Rings, on the Omega stopwatches and the related custom pouches and ribbons.

36.    Plaintiff desires a judicial determination of the respective rights and duties of Plaintiff, Omega and defendant IOC, and each of them, with respect to the use of the IOC intellectual property, including the Olympic Rings, on the Omega stopwatches and the related custom pouches and ribbons, including but not limited to (a) Omega's right to utilize the IOC intellectual property and Olympic Rings on the three special edition stopwatches; (b) Omega's right to utilize the IOC intellectual property and Olympic Rings on the custom pouches and ribbons for Plaintiff; (c) Omega's right to engage a third-party vendor to produce the custom pouches and ribbons for Plaintiff that utilize the IOC intellectual property and Olympic Rings; and (d) Plaintiff's right to engage a third-party vendor to produce the custom pouches and ribbons that utilize the IOC intellectual property and Olympic Rings.

37.    A judicial declaration is necessary and appropriate at this time under the circumstance in order that the parties may ascertain their rights and duties with respect to the use of the IOC intellectual property, including the Olympic Rings, on the Omega stopwatches and the related custom pouches and ribbons.  Declaratory relief is necessary and appropriate at this time in order to avoid multiplicity of suits and circuitry of actions.

///

38.   Plaintiff has attempted to informally resolve these matters and has no other existing, speedy, adequate or proper remedy.

**WHEREFORE**, Plaintiff prays for judgment against defendant IOC as follows:

1.   For a judicial declaration of the respective rights and duties of Plaintiff, Omega and defendant IOC, and each of them, with respect to the use of the IOC intellectual property, including the Olympic Rings, on the Omega stopwatches and the related custom pouches and ribbons;

2.   For costs of suit herein; and

3.   For such other and further relief as the court may deem just and proper. relief as the Court deems just and proper.

Dated:   January ____, 2021        **ROWE | MULLEN LLP**

                                    **DRAFT**

                                    By:   _____

                                          Martin J. Mullen
                                          Attorneys for Plaintiff
                                          PONANI SUKUMAR.